# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Assurance Company of America,

       Plaintiff,

  v.

The American Registry of Radiologic
Technologists,

       Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 13-1136 ADM/FLN

---

Jeanne H. Unger, Esq., Bassford Remele, PA, Minneapolis, MN, appeared on behalf of Plaintiff.

Barbara M. Ross, Esq., Best & Flanagan LLP, Minneapolis, MN, appeared on behalf of
Defendant.

---

## I.  INTRODUCTION

On October 9, 2014, the undersigned United States District Judge heard oral argument on
Defendant The American Registry of Radiologic Technologists' ("ARRT") Motion for Partial
Summary Judgment [Docket No. 40] and Plaintiff Assurance Company of America's
("Assurance") Motion for Summary Judgment [Docket No. 47].  For the reasons set forth below,
Plaintiff's motion is granted and Defendant's motion is denied.

## II.  BACKGROUND

ARRT is a defendant in over 25 lawsuits (the "Underlying Actions") filed in New
Hampshire by plaintiffs alleging they contracted Hepatitis C while receiving treatment at the
Exeter Hospital.  Ross Aff. [Docket No. 43] Ex. G; Reid Aff. [Docket No. 42] Exs. B-AA.  The
Underlying Actions share in common the allegation of misconduct by David Kwiatkowski
("Kwiatkowski"), a cardiovascular technician certified as an ARRT Registered Technologist.

See, e.g., Reid Aff. Ex. B ARRT 00210.  Mr. Kwiatkowski, a carrier of Hepatitis C, stole syringes filled with Fentanyl, injected himself with the narcotic, and then refilled the syringes with saline solution.  See Unger Aff. [Docket No. 51] Exs. B-1 through B-4.  The tainted syringes were then used on the Exeter patients who became plaintiffs in the Underlying Actions. Id.

The Underlying Actions allege ARRT was negligent in investigating complaints of Kwiatkowski's use of Fentanyl while working at an Arizona hospital.  Am. Countercl. [Docket No. 11] ¶ 15.  While the allegations in the Underlying Actions vary somewhat, they share a common theme:  ARRT negligently certified Kwiatkowski as a Registered Technologist when ARRT "knew or should have known" that Kwiatkowski failed to comply with ARRT's ethical standards, posed a risk to public safety, and was incompetent to provide care.  See, e.g., Reid Aff. Exs. B-AA.  In addition to the Underlying Actions, Exeter Hospital named ARRT in a separate lawsuit seeking financial contribution from ARRT and others for settlements reached with the plaintiffs infected with Hepatitis C.  Unger Aff. Ex. C.  Exeter's claim against ARRT is based on the same factual predicate as the allegations against ARRT in the Underlying Actions. Id. ¶¶ 57-60.

**A.  The American Registry of Radiologic Technologists**

ARRT is the world's largest credentialing organization in medical imaging and radiation therapy.  Reid Aff. ¶ 3.  ARRT tests, certifies, and annually registers radiologic technologists—medical professionals whose work may include taking X-Rays, sonograms, MRIs, mammograms, ultrasounds, bone density scans, nuclear medicine scans, performing radiation therapy, or performing cardiovascular-interventional radiography.  Id.  ARRT, located

in St. Paul, Minnesota, tests, certifies, and annually registers over 300,000 radiologic technologists each year.  Id.

Candidates applying for ARRT certification are required to complete an educational and academic program developed by ARRT and meet ethical rules that are linked to specific requirements for professional practice.  Id. ¶¶ 8, 10.  The academic arm of the certification process includes passing a test, completing didactic course work, and documenting competency in an ARRT-specified list of clinical procedures for the discipline in which they are seeking certification.  Id. ¶ 8.  The ethical component requires candidates to have good moral character, certify they have not engaged in conduct that is inconsistent with ARRT's Rules of Ethics, and agree to comply with ARRT's Rules and Regulations and the Standards of Ethics.  Id. ¶ 10.

ARRT investigates all claims of violations of the Standards of Ethics and its Board of Trustees has discretion to reject any application upon determining the applicant does not meet the qualifications for certification.  Id. ¶ 11.  As part of the credentialing process, ARRT may conduct criminal background checks using public records.  Id. ¶ 10.  ARRT relies on the applicant's disclosures and any information about the applicant voluntarily provided by third parties, such as state licensing agencies and employers, in assessing the applicant's ability to comply with the Standards of Ethics.  Id.

After the initial educational and ethical requirements are met, candidates must pass an examination developed by ARRT that assesses the knowledge and cognitive skills required for intelligently performing the tasks typically required of entry level staff technologists.  Id. ¶ 12. The examination questions are written by ARRT-certified and registered radiologic technologists, radiation physicists, and radiologists.  Id.  ¶ 13.  A certificate is issued to

candidates who have met all qualifications and are eligible for certification.  Id. ¶ 14.  The

certificate grants the individual the right to use the title "Registered Technologist" so long as the

registration of the certificate is still in effect.  Id. ¶ 14.

To continue using the "Registered Technologist" title, individuals are required to

annually renew registration of their ARRT certificate.  Renewal requires complying with

ARRT's Rules and Regulations and the Standards of Ethics, and meeting ARRT's continuing

education requirements.  Id. ¶ 15.  Again, ARRT relies on the individual's disclosures and

information voluntarily provided by third parties.  ARRT may conduct further investigation

using public records, but it does not independently verify the ethical representations made by

renewal applicants.  Id. ¶ 16.

All claims of ethics violations of registered individuals that are reported to ARRT are

investigated.  Id. ¶ 17.  The investigations are undertaken by ARRT staff who are not required to

have experience or any investigatory training prior to being hired.  Id.  The Board of Trustees

may reject, revoke, or suspend renewal applications or censure an individual if the Board

determines—after the initial investigation, an opportunity for a hearing before the Ethics

Committee, and an opportunity for an appeal to the Ethics Appeal Board—that the individual has

failed to meet the qualifications for registration in the Rules and Regulations, including a

violation of ARRT's Standards of Ethics.  Id.

**B.  Assurance Company of America**

Assurance is an insurance company that issued two insurance policies to ARRT: a

Commercial General Liability policy (the "CGL" policy) and a Commercial Umbrella policy

(the "Umbrella" policy).

### 1.      The Commercial General Liability Policy

ARRT purchased from Assurance a CGL policy which began coverage on December 1,

2001.  The CGL policy was renewed annually through December 1, 2013.  The CGL policy

includes, in relevant part, the following Professional Service Exclusion:

> 2. Exclusions
> This insurance does not apply to:
>
> . . . .
>
> o.  Professional
> > (1)      "Bodily injury" or "property damages" arising out of the rendering
> > or failure to render any professional service, including but not
> > limited to:
> > > (a)      Accounting, advertising, architectural, drafting,
> > > engineering, financial, insurance or legal services, advice
> > > and instruction;
> > > (b)      Medical, cosmetic, dental, ear piercing, hair dressing,
> > > massage, physical therapy, veterinary, nursing, surgical or
> > > x-ray services, advice and instruction;
> > > (c)      Use of any tanning booth, tanning bed, tanning equipment
> > > or tanning device;
> > > (d)      Laboratory operations or services, whether medical or not;
> > > and
> > > (e)      Services performed as a funeral director or as an operator
> > > of a cemetery; and
> > > (f)      Any service, treatment, advice or instruction for the
> > > purpose of appearance or skin enhancement, hair removal
> > > or replacement or personal grooming.

Unger Aff. Ex. A ASSUR00066-69.

### 2.      The Umbrella Policy

ARRT also purchased an Assurance Umbrella policy with coverage beginning on

December 1, 2001.  The Umbrella policy was renewed annually through December 1, 2013.  The

Umbrella policy includes, in relevant part, the following Professional Services Exclusion

Endorsement:

**DESIGNATED PROFESSIONAL SERVICES OR ERRORS AND**

5

**OMISSIONS EXCLUSION**

This endorsement modifies insurance provided under the following:
COMMERCIAL UMBRELLA LIABILITY COVERAGE FORM

A)      With respect to any professional services shown in the SCHEDULE
below, this insurance does not apply to "bodily injury", "property
damage", "personal injury", or "advertising injury" due to the rendering or
failure to render any professional service; or

B)      This insurance does not apply to "bodily injury", "property damage",
"personal injury", or "advertising injury" due to the performance of
professional services for others for the professional services shown in the
SCHEDULE below, and caused by any negligent act, error or omission of
the insured's or of any person employed by the insured or any other
person for whose acts the insured is legally liable.

Id. at ASSUR00125.  The declarations page of the Umbrella policy includes the referenced

SCHEDULE and lists ARRT's business classification as "886111 – Professional and Trade

Associations – Office Only."  Id. at ASSUR00101.

Assurance defines "Professional and Trade Associations – Offices Only" as:

Establishments engaged in promoting the business interests of their members.
Activities may include research on new products and services, development of
market statistics, lobbying public officials, publication of newsletters to members.
Members may include Chambers of Commerce, bar associations, dentists
associations, engineers associations, medical associations, farm bureaus, etc.

Ross Aff. Ex. E ASSUR001731; Ex. F ASSUR001762.

**C.  ARRT's Investigation of David Kwiatkowski**

The Underlying Actions allege that on April 1, 2010, Kwiatkowski, while working as a

contract employee at the Arizona Heart Hospital, was discovered passed out in a bathroom stall

with a syringe labeled "Fentanyl" in the toilet.  See, e.g., Reid Aff. Ex. B. ¶ 9.  The Arizona

Heart Hospital reported this incident to Springboard Staffing Agency, the agency that placed

Kwiatkowski at the hospital, who then conveyed the incident to ARRT.  Id. ¶¶ 10-11.

6

ARRT received a complaint from Springboard on April 8, 2010 that included the facts surrounding the incident in Arizona.  Unger Aff. Ex. O ARRT000002.  The complaint stated: "After speaking with Arizona Heart on Thursday April 1, 2010, at approximately 3 pm, [Kwiatkowski] verbally admitted to them that he was responsible for taking a syringe of Fentanyl and injecting it himself."  Id.  On April 23, ARRT sent a letter to Kwiatkowski asking for, among other things, an explanation and state license information.  Id.  Kwiatkowski responded on July 2, 2010, claiming "the allegations of me being found semi-conscious in a bathroom stall at Arizona Heart Hospital are somewhat true. . . ."  Id.  However, Kwiatkowski's statement denied any narcotic use at the Hospital.  Id.  He further claimed he was still able to work with Springboard and that his license in Arizona was still active.  Id. at ARRT000002-03.  After receiving Kwiatkowski's statement, ARRT searched for any criminal charges against him, requested police reports from the Phoenix Police Department relating to the incident at the hospital, and searched the Arizona Radiation Regulatory Agency regarding Kwiatkowski's license.  Id.  On January 26, 2011, the Ethics Committee concluded their investigation by recommending "No Action" on the complaint against Kwiatkowski.  Id. at ARRT000004.

**D.  Procedural History**

Assurance initially agreed to defend ARRT in the Underlying Actions under a reservation of rights.  Reid Aff. ¶ 29.  Sometime thereafter, Assurance commenced this lawsuit seeking a declaration that there is no coverage for the Underling Actions under the CGL and Umbrella policies.  Second Am. Compl. [Docket No. 12] ¶¶ 51-53.  Assurance's position is that the injuries in the Underlying Actions arise from a professional service rendered by ARRT.  Id.  Therefore, the professional services exclusion in both the CGL and Umbrella policies precludes

coverage.  ARRT brought a counterclaim seeking a declaration that there is coverage under both

the CGL and Umbrella policies, arguing its services are not professional in nature.  Am.

Countercl. ¶¶ 32-36.  After discovery, both parties now seek summary judgment.[1]

## III.  DISCUSSION

### A.  Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall

be rendered if there exists no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law.  The United States Supreme Court, in construing Federal

Rule 56(c), stated in Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986):

> In our view, the plain language of Rule 56(c) mandates the entry of
> summary judgment, after adequate time for discovery and upon
> motion, against a party who fails to make a showing sufficient to
> establish the existence of an element essential to that party's case,
> and on which that party will bear the burden of proof at trial.

On a motion for summary judgment, the court views the evidence in the light most

favorable to the nonmoving party.  Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1134 (8th Cir.

1999).  However, the nonmoving party may not "rest on mere allegations or denials but must

demonstrate on the record the existence of specific facts which create a genuine issue for trial."

Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

### B.  The Commercial General Liability Policy

The CGL policy excludes coverage for injuries arising out of the rendering of a

---

[1]  ARRT is moving for partial summary judgment on the second and third causes of
action in its Amended Counterclaim.  ARRT's remaining claims relate to a dispute over defense
costs and attorney's fees.  These issues have been bifurcated from the decision of coverage,
which is the question presented here.

professional service.  Unger Aff. Ex. A ASSUR00066-69.  Assurance argues the professional

service exclusion bars coverage for the Underlying Actions because the claims against ARRT

arise from its credentialing of Kwiatkowski.  ARRT's credentialing process, Assurance argues,

is a professional service.  ARRT argues the exclusion is not applicable because "credentialing,"

or any similar activity, is not found in the examples of professional services listed in the

exclusion.  ARRT also argues the exclusion cannot apply because the insured, ARRT, had no

direct contact with any of the plaintiffs in the Underlying Actions.  Assurance responds by

arguing the policy language commands a view of professional services that is broader than the

listed examples.  Assurance also argues the professional services exclusion does not require the

direct relationship ARRT asserts because the policy language "arising out of" only requires a

causal relationship between the insured and the claimants.

      Because jurisdiction in this action is based on diversity, Minnesota law controls the

resolution of this controversy.  Barry v. Barry, 172 F.3d 1011, 1013 (8th Cir. 1999).  In

Minnesota, "[p]rovisions in an insurance policy are to be interpreted according to both 'plain,

ordinary sense' and 'what a reasonable person in the position of the insured would have

understood the words to mean.'"  Farmers Home Mut. Ins. Co. v. Lill, 332 N.W.2d 635, 637

(Minn. 1983) (quoting Canadian Universal Ins. Co. v. Fire Watch, Inc., 258 N.W.2d 570, 572

(Minn. 1977)).  Unambiguous contract language is given its plain and ordinary meaning.

Lobeck v. State Farm Mut. Auto. Ins. Co., 582 N.W.2d 246, 249 (Minn. 1998) (citing Bobich v.

Oja, 104 N.W.2d 19, 24 (Minn. 1960)).  "[A] policy provision is ambiguous if it can reasonably

be given more than one meaning on the basis of its language alone."  In re SRC Holding Corp.,

545 F.3d 661, 666 (8th Cir. 2008) (citing Am. Commerce Ins. Brokers, Inc. v. Minn. Mut. Fire &

Cas. Co., 551 N.W.2d 224, 227 (Minn. 1996)).

Exclusions in insurance policies are read narrowly against the drafter.  Atwater Creamery Co. v. Western Nat'l Mut. Ins. Co., 366 N.W.2d 271, 276 (Minn. 1985).  As the insurer, Assurance carries the burden of proving the professional services exclusion applies.  Henning Nelson Constr. Co. v. Fireman's Fund Am. Life Ins. Co., 383 N.W.2d 645, 652 (Minn. 1986). Exclusions are construed in the context of the policy as a whole.  Bobich, 104 N.W.2d at 24-25.

     **1.**      **The plain and ordinary meaning of the professional services provision is not restricted to the enumerated examples**

ARRT argues that their credentialing services cannot be included in the CGL policy's professional services exclusion because the professional services in the exclusion language do not include "credentialing" or any similar activity.  Assurance submits the phrase "any professional service, including but not limited to:" immediately preceding a list of examples, expresses the intent of the policy language to include professional services beyond those specifically enumerated.  Therefore, according to Assurance, the list is merely examples of the types of professional services excluded from coverage.

The word "including" connotes an illustrative application of a general principle.  Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 189 (1941).  The words, "including but not limited to, ordinarily mean that a list is incomplete and only illustrative in nature."  Dan's Super Mkt., Inc. v. Wal-Mart Stores, Inc., 38 F.3d 1003, 1006 n.2 (8th Cir. 1994) (citing Americana Healthcare Ctrs.-Minot & Fargo v. North Dakota Dep't of Human Servs., 510 N.W.2d 592, 594 (N.D. 1994)).  "The phrase 'including, but not limited to' is an expression of enlargement."  Nautilus Ins. Co. v. K. Smith Builders, Ltd., 725 F. Supp. 2d 1219, 1226 (D. Haw. 2010).  "Any" is afforded a meaning that is similarly expansive . U.S. v. Gonzales, 520 U.S. 1, 5 (1997).

In this case, the policy's use of the phrase "<u>any</u> professional service, <u>included but not</u> <u>limited to</u>. . ." (emphases added) unambiguously establishes that the six examples of professional services are only illustrative of the professional services excluded from coverage.  This conclusion comports with settled law and honors the language of the policy.  Holding otherwise, as ARRT invites, would ignore the unambiguous policy language.

ARRT next argues that the examples explicitly included in the policy must be analyzed to determine what other types of "professional services" are excluded.  ARRT argues that since the enumerated examples of "professional services" all require direct contact between the insured and a person receiving the service, ARRT's credentialing must also possess a similar relationship.[2]  Accepting ARRT's argument, however, requires ignoring a specific directive of the CGL policy—that the professional services exclusion applies to "<u>any</u> professional service, <u>including but not limited to:</u>" (emphases added).  Moreover, the phrase "arising out of," which is present in the CGL policy, only requires but-for causation.  <u>Andrew L. Youngquist, Inc. v.</u> <u>Cincinnati Ins. Co.</u>, 625 N.W.2d 178, 184 (Minn. Ct. App. 2001).  This broad causal construct further maligns ARRT's position because the plaintiffs in the Underlying Actions allege that but-for ARRT's negligent credentialing of Kwiatkowski, their injuries would not have occurred.

In <u>Shelter Ins. Cos. v. Hildreth</u>, the Court stopped short of requiring an analysis of

---

[2] At the hearing, counsel for Assurance argued that an injury arising from advertising services, included in the list of examples, could have a similar degree of separation between claimant and insured.  For example, if an individual suffers injury after trying to mimic something demonstrated in an advertisement, the advertising agency, as the insured, would have the same degree of separation from the claimant as ARRT has with the New Hampshire plaintiffs.  While this example is not dispositive, it does effectively rebut ARRT's position that its credentialing activities cannot be a professional service because all of the listed examples require direct contact between the insured and a person receiving the service.

similarity between the claimed service and the professional service examples included in the policy. 255 F.3d 921, 926 (8th Cir. 2001). In deciding that naprapathy was a professional service, the comparison between naprapathy and the listed professional services was not outcome-determinative to that decision. Rather, the similarity of naprapathy and the other professional services listed in the policy was "telling."[3] Id. Naprapathy was deemed a professional service because it satisfied the calculus of what makes a service a professional service and because naprapathy was closely related to other professions explicitly mentioned in the policy. Id. at 925-26. Thus, attention must be primarily focused on whether ARRT's credentialing service conforms to the judicial prescription of what makes a service professional in nature.

**2.      ARRT's credentialing is a professional service**

The parties also dispute whether ARRT's credentialing service meets the judicially recognized standard of a professional service. Although the policy lists examples of professional services, it does not define the term "professional service." Assurance argues that the professional services exclusion applies because the claims against ARRT in the Underlying Actions arise from ARRT's exercise, or failure to exercise, its specialized knowledge and skill in the certification of Kwiatkowski. To support its claims, Assurance argues ethical investigations comprise a core component of ARRT's business requiring specialized skill and knowledge. This, Assurance contends, forces the conclusion that ARRT's credentialing activities are a

---

[3] The CGL policy at issue here differs from Hildreth, which lacked the expansive word "any" when describing the professional services that were excluded under the policy's professional services exclusion. See Hildreth, 255 F.3d at 924. The policy did, however, include the phrase "including but not limited to." Id.

professional service.

ARRT contests Assurance's characterization of their investigative practices, noting that the ethical investigations are conducted by people without specialized skill or training, involve searching only public records and databases, and rely primarily on the representations made by the applicants and third parties.  ARRT further argues the ethics component is only a portion of their overall business; focusing on the ethical procedures therefore ignores significant elements of ARRT's business that are non-professional in nature.  Last, ARRT argues the professional exclusion cannot apply because the harmed plaintiffs lacked direct contact with ARRT, the insured.  This fact, ARRT contends, would uniquely extend the application of professional services exclusions into an area Minnesota courts have yet to authorize.

Courts have understood "[p]rofessional services [] as services 'arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill.'"  Houg v. State Farm Fire & Cas. Co., 509 N.W.2d 590, 592 (Minn. Ct. App. 1993) (quoting Harad v. Aetna Cas. & Sur. Co., 839 F.2d 979, 984 (3rd Cir. 1988)).  "The labor or skill involved [in a professional service] is predominately mental or intellectual rather than physical or manual."  Hildreth, 255 F.3d at 925 (citing Multnomah Cnty. v. Or. Auto. Ins. Co., 470 P.2d 147, 150 (Or. 1970)).  Attention is directed to the act itself in determining whether a particular service or treatment is professional.  Am. Econ. Ins. Co. v. Jackson, 476 F.3d 620, 625 (8th Cir. 2007) (citing Hildreth, 255 F. 3d at 925).

In Ministers Life v. St. Paul Fire & Marine Ins. Co., a professional services exclusion barred coverage against a claim precipitated by distributing an allegedly defamatory letter.  483 N.W.2d 88, 89-90 (Minn. Ct. App. 1992).  The insured's claim that the act of sending the letter

was ministerial and not professional was rejected because the contents of the letter required

business and insurance expertise and judgment.  Id. at 90.  A professional service exclusion was

also triggered when a health care center's administrator made the decision to refrain from

engaging the center's air conditioning system.  Am. Econ. Ins. Co., 476 F.3d at 625-26.  Because

the decision not to engage the climate system required an exercise of professional judgment that

drew upon training, knowledge, and experience, the exclusion applied.  Id.

> a.     **The decisions of the Ethics Department and the Ethics Committee required an exercise of professional judgment guided by specialized training, knowledge, and expertise**

ARRT's decision to take no action against Kwiatkowski and re-certify him in 2011

required an exercise of personal judgment guided by specialized training, knowledge, and

experience.  When ARRT received the complaint of Kwiatkowski's incident in the Arizona

Hospital restroom, ARRT's Ethics Department investigated the allegations according to its

established investigatory procedures.[4]  See Unger Aff. Ex. O; Ex. N.  After the investigation was

finished, the Ethics Department recommended "no action" on the complaint.  Unger Aff. Ex. O

at ARRT000004.  This recommendation and the Ethics Department's case summary were

reviewed by the Ethics Committee.  See id.  The Ethics Committee adopted the Ethics

Department's recommendation of "no action."  Unger Aff. Ex. U 78:11-24.  Following the Ethics

---

[4] The Ethics Department was governed, at least in part, by a Policies and Procedures Manual.  Unger Aff. Ex. N.  The Manual includes information regarding ethics investigations and decisions, risk levels for specific violations, and the range of actions ARRT had previously taken for similar situations.  Id. at ARRT09955-09982.  The Manual was developed and updated by the Director of the Ethics Department in conjunction with the Board of Trustees.  Unger Aff. Ex. I ("Gehrig Dep.") at 14:16-24.  The Director of the Ethics Department and members of the Board of Trustees each possessed first-hand knowledge of what is required of a radiologic technologist.  Unger Aff. Ex. F ARRT01538; Gehrig Dep. at 10:19-22; 32:9-14.

Committee's decision, Kwiatkowski was allowed to maintain his ARRT certification.

The investigatory process included at least two discrete instances where professional judgment was exercised. First, the Ethics Department's "no action" decision was predicated on the results of the Department's own investigation. Even if, as ARRT claims, the investigation was a limited examination into Kwiatkowski's alleged ethical violation, ARRT is unable to show the Ethics Department's decision was a *pro forma* result reached on the basis of an automatic or otherwise perfunctory analysis. To the contrary, the individualized inquiry into the Kwiatkowski incident necessitated at least a modicum of decision-making unique to his personal situation. The decision to issue a "no action" recommendation was informed by the Ethics Department's specialized skill and knowledge of ethics violations and was an intellectual decision that required an exercise of professional judgment.[5]

---

[5] ARRT asserts that the aptitude to conduct the ethics investigations does not require any specialized knowledge, education, or training. ARRT further asserts the skills necessary to conduct the ethics investigations are typically learned on the job because no prior training or experience in investigations is required prior to employment. Therefore, ARRT concludes, the investigations cannot inform the basis for a determination that credentialing is a professional service. This line of reasoning is unpersuasive for three reasons. First, ARRT incorrectly argues that an individual is required to have formal training prior to rendering a professional service. See Ocean Acc. & Guarantee Corp. v. Herzberg's, Inc., 100 F.2d 171 (8th Cir. 1938) (holding that a cosmetician's use of a hair removal machine was a professional service despite the cosmetician's testimony that she lacked any specialized training to operate the machine). Second, the Supervisor and Assistant Supervisor of the Ethics Department, two of the four employees responsible for ethics investigations, were radiologic technologists. Unger Aff. [Docket No. 59] ("Unger Aff. II") Ex. W 9:1-22, 18:5-10; Ex. V 46:22-25, 47:1-3. At a minimum, these individuals possessed knowledge, skill, and education that had some bearing on the performance and outcome of the investigation. Their specialized skills were injected into the decision-making process. Finally, even if ARRT's characterization of the investigation is adopted, the professional services exclusion still applies because the clerical act of performing an investigation is necessary to properly perform the professional service of credentialing. See Bohreer v. Erie Ins. Grp., 475 F. Supp. 2d 578, 585, 587 (E.D. Va. 2007) ("There is simply no doubt that where, as here, the 'clerical' act is necessary to perform the professional service properly, that act 'arises out of' a professional service).

Second, the Ethics Department's "no action" recommendation was reviewed by the Ethics Committee, the body vested with the final decision-making authority for all alleged ethical violations.  Id.  The Ethics Committee, at the time relevant here, was comprised of three ARRT-certified radiologic technologists and a doctor of medicine.  Unger Ex. L at 49-50.  The Ethics Committee's decision, while shaped by the Ethics Department's recommendation, was again not a ministerial or mechanical decision.  ARRT is unable to conclusively show the Ethics Committee's review was cursory or simply a rubber stamped approval of the Ethics Department's recommendation.  The evidence is that the Ethics Committee can, among other things, order additional investigation or temporarily suspend an radiologic technologist pending the outcome of an investigation.  Unger Aff. Ex. K at 80:0-14, 84:6-20.  As to Kwiatkowski, the Ethics Committee decided the Ethics Department's investigation and case summary formed a sufficient foundation for rendering their decision.  In adopting the "no action" recommendation, the Ethics Committee exercised professional judgment by leveraging their experiences, skills, and knowledge.

Similar to the facilities administrator deciding not to engage the air condition system in American Economy, the Ethics Department's recommendation of "no action" and the Ethics Committee's adoption of that recommendation involved weighing the results of the ethics investigation in exercising their professional judgment.  Their determinations rested on the training and experiences of the members of the Ethics Department and the Ethics Committee, at least some who were radiologic technologists or other medical professionals whose occupations

require specialized knowledge and skill.[6]

ARRT's attempt to avoid the professional services exclusion rests mainly in diluting the rigorousness of its ethical investigations. ARRT argues the investigations are undertaken by ARRT employees with no specialized training whose investigatory scope is limited to public databases and is greatly curtailed by due process concerns. ARRT's position, however, mistakenly argues the ethics investigation itself is the sole consideration that drives the conclusion here; it is not. While the investigation does factor into the determination, the critical concern is more comprehensive than simply the rigorousness of the investigation of Kwiatkowski. More important is the overall amount of professional judgment that went into the decision to continue credentialing Kwiatkowski and re-certify him a year later in 2011.

> **b.** **Expansive view of ARRT's business does not alter the conclusion that credentialing is a professional service**

ARRT argues that since the ethical investigations only comprise a small amount of ARRT's complete business, exclusively relying on such a small segment to determine that credentialing is a professional service is improper. ARRT's position, however, is undermined by the academic and examination components of ARRT's business. Viewing the entirety of ARRT's business only reinforces the conclusion that credentialing is a professional service.

The educational and examination components of ARRT are core functions of its

_____

[6] ARRT cites an unpublished Court of Appeals decision for the proposition that knowledge of the radiologic technologist profession generally is irrelevant and only knowledge of the investigation of Kwiatkowski should be considered. American States Ins. Co. v. Grohn, No. C1-95-657, 1995 WL 564877 (Minn. Ct. App. Sept. 26, 1995). Assuming but not deciding that the Court's attention is limited to the purview established in Grohn, the ultimate conclusion is undisturbed because the individuals investigating Kwiatkowski tapped their specialized knowledge and skills in order to make decisions that hinged on Kwiatkowski's ethical investigation.

credentialing service.  All applicants and registrants seeking certification are required to pass an examination developed and administered by ARRT-certified and registered radiologic technologists, radiation physicists, and radiologists.  Reid Aff. ¶¶ 4, 13.   ARRT represents that the examinations are designed to ensure applicants possess the needed skills and knowledge essential to performing their job.  Designing examinations intended to assess the knowledge and skills of individuals pursuing a professional occupation clearly requires specialized knowledge and skill.  Because passing the examination is a precursor to earning ARRT's mark of approval, it necessarily follows that creating and tailoring the examinations to meet the goal of assessing the skills and knowledge of a professional job are in and of themselves, professional services.

> c.   **The professional services exclusion includes ARRT's credentialing service because the policy language only requires but-for causation**

ARRT argues that Minnesota courts have applied professional services exclusions only when insureds provide services directly to a claimant.  Therefore, ARRT concludes, the professional services exclusion cannot apply to the claims raised against ARRT in the Underlying Actions.

ARRT's "direct contact" argument is premised on a survey of the Minnesota court decisions addressing professional services exclusions cited by Assurance, all of which feature a direct insured-to-claimant relationship.  This direct relationship, however, is not described as a required or essential element for the exclusion to apply.  Indeed, the position ARRT advances has been addressed and rejected by other jurisdictions.  The Third Circuit held that privity between the insured and the claimant was not required for a professional services exclusion to apply.  Harad, 839 F.2d at 983-84.  The Seventh Circuit reached the same conclusion.  See Hurst-Rosche Engineers, Inc. v. Commercial Union Ins. Co., 51 F.3d 1336 (7th Cir. 1995)

(exclusion applied to claims that the insured engineering firm's inspection report defamed and tortiously interfered with the contract of a general contractor).  Absent any policy language to the contrary, privity between the insured and the claimant is not a required element for a professional services exclusion to apply.

## C.  The Umbrella Policy

The Umbrella policy also includes a professional services exclusion.  The Umbrella exclusion is worded differently than the CGL exclusion.  Rather than a list of examples of professional services that are covered by the exclusion, the Umbrella's exclusion states only: "Designated Professional Service[]: 88611 – Professional and Trade Associations – Offices Only."  Unger Aff. Ex. A ASSUR00101.  Assurance defines "Professional and Trade Associations – Offices Only" as:

> Establishments engaged in promoting the business interests of their members. Activities may include research on new products and services, development of market statistics, lobbying public officials, publication of newsletters to members. Members may include Chambers of Commerce, bar associations, dentists associations, engineers associations, medical associations, farm bureaus, etc.

Ross Aff. Ex. E AASSUR001731.  The applicability of the professional services exclusion in the Umbrella policy rests on a determination of whether ARRT's business meets Assurance's definition of "Professional and Trade Associations – Offices Only."

ARRT argues that the Umbrella exclusion does not cover ARRT because it is not a professional membership organization formed for the purpose of promoting the business interests of its members.  ARRT supports its argument by claiming its business is credentialing, which is an achievement earned by passing educational and ethical requirements.  Further, ARRT claims it should not be construed as a "Professional and Trade Association" because ARRT operates a

registry of registrants, not members.  Finally, ARRT argues that if the Umbrella professional services exclusion applies, coverage under the policy is illusory because virtually any claim would be barred by the exclusion.  Assurance counters by arguing that the definition of "Professional and Trade Associations – Offices Only" merely requires ARRT to be "engaged in promoting the business interests of [ARRT's] members."  Additionally, Assurance argues ARRT's contention that "registrants" are somehow distinct from "members" is a manner of semantics as the meanings are both essentially the same.

1.      **The definition of "Professional and Trade Associations – Offices Only" applies to ARRT**

ARRT argues the definition of "Professional and Trade Associations – Offices Only" does not describe ARRT's business.  ARRT's position largely rests on its assertion that it is not a professional membership organization formed for the purpose of promoting the business interests of its members.  ARRT's position, however, misstates the language of the Umbrella policy's professional services exclusion.  The exclusion does not turn on whether ARRT was <u>formed</u> for the purpose of promoting the business interests of its members.  Rather, the exclusion only requires ARRT to be <u>engaged</u> in promoting the business interests of the its members.  Thus, the applicability of the exclusion rests on whether ARRT is engaged in promoting the business interests of its members.

a.      **ARRT is engaged in promoting the business interests of its members**

The definition of "Professional and Trade Associations – Offices Only" includes examples of activities that may be used to determine whether or not a business is engaged in promoting the business interests of its members.  The activities are:  "research on new products and services, development of market statistics, lobbying public officials, publication of

20

newsletters to members." Ross Aff. Ex. F ASSUR001762. ARRT routinely engages in these

activities. ARRT's 2011 Annual Report to Registered Technologists states ARRT is working "to

make radiologic assistants more viable in the marketplace." Unger Aff. II Ex. FF ARRT09046.

ARRT has also participated in research, published market statistics, lobbied public officials, and

published newsletters, all of which are activities included in the definition. See, e.g., id. Ex. GG

(noting a study between the University of Minnesota, the National Cancer Institute, and ARRT);

Ex. HH (statistics by state and modality); Ex. FF at ARRT09046-45 ("Late in 2010, ARRT

began working with a lobbyist who has advocacy experience with CMS and Congress. . . . The

federal lobbying effort is focused on recognizing already existing state laws"); Ex. JJ (showing

the "Newsletter for R.T.s" in the "Publications" section of ARRT's website). Thus, under the

plain definition under the Umbrella policy, ARRT is engaged in promoting the business interests

of their members.

### b.     Any difference between "Members" and "Registrants" here is merely semantic

ARRT argues the exclusion cannot apply because it does not have members; rather, it is a

registry comprised of registrants. Assurance's riposte is that the difference is one of semantics

only. Although a member and a registrant are not completely synonymous, the relevant

similarities outweigh the differences.

It is true that ARRT does not have members. This fact alone, however, does not raise the

gate barring ARRT coverage. For all practical purposes, ARRT's registrants function in the

same manner as members. For example, before an individual can become a registrant of ARRT

or a member of a listed association—a bar association, for example—they must meet educational

and ethical requirements; registrants of ARRT must meet ARRT's educational and ethical

requirements just as members of a bar association must be a member of a bar, which requires

passing an academic examination and meeting ethical requirements.[7]

Accepting ARRT's argument unduly emphasizes form over function.  Their position

would allow coverage to be defeated simply by altering the name to a synonym other than the

term mentioned in the policy.  This would be improper.  The correct analysis must drive at the

function of the collection of individuals, not simply what they are called.  Any distinction

between a member and a registrant is a distinction without a difference.

**2.     Coverage for the Underlying Actions under the Umbrella policy is excluded by Subpart A**

Having concluded that ARRT's business fits the Umbrella's definition of professional

services, the final step is determining if the claims in the Underlying Actions are "due to the

performance" of ARRT's business.

It is undisputed that the claims in the Underlying Actions allege ARRT was negligent in

credentialing Kwiatkowski.  Therefore, because the bodily or personal injuries claimed in the

Underlying Actions arise from ARRT's professional service, the Umbrella policy's professional

services exclusion applies.

**3.     Coverage is not illusory**

As their final argument, ARRT submits that the professional services endorsement in the

Umbrella Policy excludes coverage for virtually any type of claim submitted under the Umbrella

Policy.  This, ARRT argues, renders the coverage illusory.  Assurance's stance is that coverage

---

[7] The similarity is not limited to bar associations.  Other associations listed in the policy, such as dentists associations and engineers associations, require meeting similar requirements prior to admission.

is not illusory because ARRT is unable to identify a specific portion of its premium allocated to covering claims arising from its credentialing service.  Assurance argues that ARRT's claim that the Umbrella policy's exclusion would restrict every potential claim submitted under the policy is incorrect.

The doctrine of illusory coverage is "an independent means to avoid an unreasonable result when a literal reading of a policy unfairly denies coverage." Jostens, Inc. v. Northfield Ins.Co., 527 N.W.2d 116, 118 (Minn. Ct. App. 1995).  "A policy's coverage is illusory if it turns out to be functionally nonexistent." Johnson v. Cummiskey, 765 N.W.2d 652, 662 (Minn. Ct. App. 2009) (citing Jostens, 527 N.W.2d at 119 (internal quotation marks omitted)).  Illusory coverage may apply "where part of the premium is specifically allocated to a particular type or period of coverage. . . ." Jostens, 527 N.W.2d at 119.

ARRT is unable to identify a portion of its premiums that were specifically allocated to provide coverage for the claims alleged in the Underlying Actions.  Without identifying a portion of the Umbrella premium that was specifically allocated for claims arising from its credentialing services, ARRT's illusory coverage claim fails as a matter of law.  See Scottsdale Ins. Co. v. The RiverBank, 815 F. Supp. 2d 1074, 1086 (D. Minn. 2011) (applying Minnesota law and noting that the illusory coverage doctrine was inapplicable because there was no evidence that a premium was specifically allocated for the type of action giving rise to the claim).  Additionally, contrary to ARRT's assertion, coverage does exist under the Umbrella policy.[8]  Thus, ARRT is unable to meet the very high standard of proving coverage is

---

[8] Assurance's memorandum identifies four instances of damage that would be covered under the Umbrella policy, including "[b]odily injury coverage for people hurt on ARRT's premises" and "[p]roperty damage coverage for damage to third-party property."  Pl.'s Mem.

functionally nonexistent. <u>BancInsure, Inc. v. Marshall Bank, N.A.</u>, 400 F. Supp. 2d 1140, 1144 (D. Minn. 2005).

**D. Number of Occurrences Triggered by the Underlying Actions**

ARRT and Assurance disagree as to the number of "occurrences" caused by the Underlying Actions. Because the professional services exclusions in the CGL and Umbrella policies release Assurance from indemnifying ARRT for claims asserted in the Underlying Actions, the disagreement does not need to be resolved here.

---

Opp'n Summ. J. [Docket No. 58] 31.

## IV.  CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.  Plaintiff's Motion for Summary Judgment [Docket No. 47] is **GRANTED**.

2.  Defendant's Motion for Partial Summary Judgment [Docket No. 40] is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


_____ s/Ann D. Montgomery _____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  December 1, 2014.